Next case of the morning is number 18-30019, Koerner v. CMR Construction, and we will hear from, pardon, we'll hear from Mr. Koerner first. I'm Louis Koerner. I'm not an unreasonably expected CMR whose president, with whose president I have a personal relationship to enter an appearance and defend. We've already briefed the applicable law. Until we received CMR's discovery responses, I had no idea to the CMR's president, I believe he would be honorable and respond in a reasonable manner. Accordingly, I did everything. Mr. Koerner, if what you're talking about is their appellee brief? No, of course not. Okay. What are you talking about? I'm talking about what they did is after, okay, I expected them to respond to the lawsuit. This is on the default. Okay. I called, I wrote, I did everything. I calculated approximately between what the court did and I did was 11 times they got notified. I notified that the insurance company had been sued and I contemplated them being sued. I wrote them, I sent copies of everything. I texted, I called Steve Soule. I did everything that possibly to be done in order to do that. Now, they never did. The court also notified them of the default, the entry default. They notified them. Finally, when there was a $500,000 judgment, they show up, but they show up with absolutely false affidavit. So after, at that particular point, I didn't think that the district court judge should have granted the motion to set aside the default. Okay. But be that as it may, we then took the deposition of the president of the company, Steve Soule, and he had gotten everything. Everything had gone to Sandra Durie address, all properly done, and everything that they said in their affidavit was false. Okay. So we then filed a 59E and I lined every bit of that out. But the district court judge didn't ask them to respond. He simply denied it. It's beyond anything I've ever seen. There should be some consequences if you don't tell the truth and you file a false affidavit. And certainly, there should be a situation in which Judge Afric says, hey, guys, give me an explanation. The first explanation that they've given is in this court. And they don't deny any of the things. And it's all totally inconsistent. Now, when federal judges deny post-trial motions, they're supposed to tell you why. Well, they didn't. So that's basically my argument. I'm happy to answer questions. And I have more detail as to every time I call, I text message, I left a word. I thought this guy was honorable and a friend. And so it was just baffled as to why he didn't do it. So under the circumstances, I think it's abuse of discretion not to have set aside the default initially, but more importantly, to have set aside either a 59A. All right, counsel. Thank you. Okay. Thank you, sir. Mr. Mahone. May it please the Court, Michael Mahone on behalf of Louis Kerner. And while Mr. Kerner is dealing with the default judgment issues, I'm here to talk about the summary judgment side of this. And the summary judgment errors in the case are really procedural in nature. There was first the lack of notice of the grounds upon which the district court would grant the summary judgment. And then there was also a failure to adhere to standards in the course of ruling on the evidence and considering everything. And that included failing to accept evidence as true, construing evidence against the non-movement, credibility determinations, a number of issues. But for initial purposes, CMR chose not to brief any of these issues. And they're briefed to this court. They don't address any of the . . . Let me just point out, I thought the tone of the brief was unusual, to put it kindly. But an appellee is not even required to file a brief in our court. And I can understand that, Your Honor. But I guess our position would be to the extent that they have any objections, they've waived them by not briefing them before this court. While it is true that they don't have to . . . Can't waive something you don't have to do. Well, I agree, Your Honor, that perhaps they shouldn't have the benefit of oral argument on those issues. Would that be a just result? Well, they're here now. No. Understandable, Your Honor. It's a turning then to the . . . I mean, if it, you know, if his oral argument is no better than his brief, that will not help. But go on. Thank you, Judge. Turning then to the lack of notice, there's a number of claims that were at issue. And taking them one at a time, there's a fraud claim in connection with the purchase of the roof in 2005-2006. The only ground CMR sought the dismissal of that claim was that it had prescribed, which wasn't reached by the district court. Specifically, they say they didn't get to that. Then there were detrimental reliance and negligence claims that related to work that was done in November of 2012. They sought the dismissal of those claims on the basis of preemption pursuant to Revised Statute 9,2772. And the problem with that is those claims were within five years, so they would not be preempted. And that was the only basis on which they sought the dismissal of those claims. They didn't argue that the relationship between them and Brian Velasquez, the contractor, was a basis for dismissal, the assurances were too vague, that they didn't make a, quote, promise to Mr. Kerner, or that his reliance on any assertions was unreasonable. Those are all grounds relied upon by the district court in dismissing the claims, and we would submit that that was error. Now, we agree that it can be harmless if the subsequently produced evidence doesn't create a genuine issue of material fact. Here, though, it did, especially when combined with the initial evidence submitted in opposition to the summary judgment. JUSTICE GINSBURG You know, when I was reading your brief, the first question that sprang into my mind is exactly what was the fraud? Because I can't tell, I couldn't tell, and maybe I just overlooked something, whether the fraud was that this was not a, quote, traditional slate roof or that it was a fraud because it had a membrane. MR. KERNER And I think that I can explain that, Your Honor. The fraud was, and this is what we say in, or what Mr. Kerner said in his declaration, which is a record document, 1447, CMR intentionally misrepresented slate 2.0 was a new and improved version of a traditional slate which still possessed all the attributes of a traditional slate roof but was better in every meaningful way. What they didn't say was that this roof is a decorative slate facade over a membrane, a membrane that's prone to degradation, puncture, anything else to where the slates themselves provide no protection, it's the membrane. And now it is true that Mr. Kerner knew that there was an underlayment, but he didn't realize that that was the only underlayment, was, for lack of a better way of putting it, the magic ingredient that would allow them to warranty this for 75 years or — JUSTICE SOTOMAYOR Does the contract specify what the materials were? MR. KERNER I believe the contract specifies that it is a slate 2.0 roof, and we have not disputed that Mr. Kerner knew that there was an underlayment that was utilized with this, but — JUSTICE SOTOMAYOR He knew it wasn't felt. MR. KERNER He knew that it wasn't felt, but that was not the basis of the claim. The basis of the claim is you're using a different underlayment, but it's still not — the slates are providing no protection. It's not a slate roof in the traditional sense. It is — JUSTICE SOTOMAYOR Is it a slate or rubber? MR. KERNER Excuse me? JUSTICE SOTOMAYOR Is it a real slate? MR. KERNER It is real slate, but where the slates themselves provide no protection, whereas on a traditional slate roof, the slates themselves protect the house from the elements. JUSTICE SOTOMAYOR I find that — I mean, if you get — if you have regular shingles on a roof, are you arguing that because you have an underlayment of some sort on a regular roof that the shingles provide no protection whatsoever? That can't be right. MR. KERNER Well, here — JUSTICE SOTOMAYOR It's always — the roof has multiple components, right, each of which is supposed to serve a purpose. MR. KERNER And I think with a traditional slate roof, the slates themselves are overlapped and are protecting the house from the elements, whereas here, I don't believe that is the case, and the issue is the water — in the traditional slate roof, right? MR. KERNER Yes, Your Honor, that's true. But the problem with it is the shingles themselves are the protection. It's not the felt. The felt is what it sits on top of. Here, the protection is the underlayment, and that was not made known to Mr. Kerner. JUSTICE SOTOMAYOR Where is that undisputed in the record? Where is it undisputed in the record that the underlayment is the protection? MR. KERNER I believe Mr. Kerner said that in his declaration. That was his appreciation of it. JUSTICE SOTOMAYOR Oh, okay. MR. KERNER Just to be more specific, Judge, I can look at a record document, 2023, wherein it says the traditional slate roof is comprised of a functional slate with the slate itself providing protection, whereas Slate 2.0 is merely a decorative slate facade where the only protection is a membrane that is prone to puncture and UV degradation. So moving on beyond the fraud in connection with the initial purchase of the roof, there were claims relating to subsequent work that was done on the roof, and this work began in 2011 and was completed in 2012. In 2011, Mr. Kerner had an inspection report from a roofing company called Guarantee, which he provided to CMR and said, hey, there's problems with the roof. You need to come out and fix it. CMR sent someone out there who inspected it and assured Mr. Kerner in 2011 they would take care of everything. At the same time, this employee sends an email back to people at CMR and says, I went out there, I told him this, but I didn't tell him what I found, but I assured him we would take care of it. Fast forward through 2012, Mr. Kerner is still having problems with his roof. Then we get to November of 2012 where a final effort is made between Mr. Kerner and CMR to resolve any... Mr. Kerner goes out and hires Velazquez, right, or Vasquez. He goes out and hires him, and then he gets CMR to kick in part of the cost. I think that is misleading. What happened was Mr. Velazquez, Brian Velazquez, was provided to Mr. Kerner by a gentleman named Gary Clocky, who worked for CMR, after Mr. Kerner had complained to Mr. Clocky about continuing issues with the roof. CMR was not responding to Mr. Kerner, so Mr. Kerner said, fine, I'll just make a deal with your guy on the side and get this taken care of. Well, then CMR does come in, and in November of 2012, I believe it was November 1st of 2012, Steve Soule, the president of CMR, comes out with Mr. Velazquez, with Mr. Kerner, and they devise a scope of work to address the issues that Mr. Kerner was having with his roof. So the contract that was discussed by Judge Afric in his initial order of reasons was never signed. This was Mr. Kerner telling CMR, I'm going to go make a deal with your guy because y'all aren't responding to me, and then I will turn around and file suit against you. Then CMR comes out, they devise a scope of work that will supposedly address all the issues that he was having, and in the course of doing this, CMR provided the scope of work. That's document 2354 in the record. CMR's president referred to the work as the CMR work, and email correspondence with Mr. Kerner. That's 2357 in the record. CMR supervised the contractor's work. That's 2358 in the record. Now, is all that from, you say that, are all those from Mr. Kerner's declaration? Oh, no, Your Honor. Those are all email correspondence, back and forth between CMR's people and Mr. Kerner during the pendency of these November repairs. There's discussion in there about issues with Mr. Velasquez's work that were discovered by CMR and corrected by CMR, and that CMR ultimately signed off on Mr. Velasquez's work at the end of it. So, if there, do you have any questions for me, Your Honor? I think I'm out of time. I don't think so. There are a lot of facts here, and we can't get into them all right now, but we do have the record. Well, I will save the rest of my argument for a bottle. Thank you. All right, sir. Thank you. All right, Mr. Perkins. Leads the Court, Steve Perkins for the Appellee CMR Construction and Roofing, LLC. This is an unusual case because of the time elements, largely. It's an unusual case because of the snarkiness of your brief, to express an opinion for myself only. Well, I apologize to the Court if the Court viewed it that way. Well, I mean, you didn't need to . . . I understand if you desired not to spend your client's money in doing a point-by-point refutation of this . . . if you didn't want to spend your client's money doing a point-by-point refutation of their claims, but on the other hand, you don't need to be quite as . . . some of the phraseology used was very verging on intemperate, so I just point that out for the future. Point taken, Your Honor. CMR replaced Lewis Kerner's roof after Katrina in 2005 and 2006. Mr. Kerner subsequently expressed concerns with the quality of the workmanship or some issues with the roof. CMR sought to address that 2006, 2007, 2011. Ultimately, Mr. Kerner complained about some other issues after Hurricane Isaac. CMR came out, looked at it, and said this is due to Hurricane Isaac. There was some further discussion, and CMR, as Your Honor indicated, had an independent contractor, Brian Vella of Velazquez, come out and address those issues. Mr. Kerner later, in April of 2016, filed suit against his homeowner's insurer, Vigilant Insurance Company. He did not name CMR as a defendant. Despite all this discussion back and forth, Vigilant removed the case to federal court from civil district court for Orleans Parish. The case was later amended in November of 2016 to add CMR. A default was entered because CMR did not respond to the suit, and as CMR's Steve Soule stated in his affidavit to the court in connection with the motion to set aside the default, that was because of several issues. One was CMR was not listed in the caption of the suit. It was captioned as Kerner v. Vigilant Insurance Company. A second was the papers themselves were addressed to a different CMR entity, and the third was Mr. Soule thought that the case was brought well too late to really involve CMR in any way. It was more than ten years after the roof had installed. Well, in light of the fact that Mr. Kerner had been repeatedly contacting Mr. Soule about the company's likely involvement as a defendant, why didn't the district court abuse his discretion under the authority of that Chinese drywall case? Well, two things. Number one, it's a totality of the circumstances type of decision. You don't just look at how many times did someone try to contact you. I think the record shows that there was actually one brief telephone conversation by cell phone. Otherwise, you've got papers coming into an office, and papers and text messages and e-mails come into offices all the time and get misdirected all the time. So I think the district court looked at what Mr. Soule said and what Mr. Kerner said and found that Mr. Soule had a viable reason for not responding to the lawsuit, and it is an abuse of discretion standard. Chinese drywall affirmed a failure to set aside. So did the earlier decision in Deerska, and that's the same with the case cited in the appellant's Rule 28J letter. It's an affirmance of a denial to set aside. Weren't the papers coming into the office that you referred to, weren't they directed to Mr. Soule? I believe that they were directed to him or to his wife, Your Honor. That's pretty close. That's right. But it doesn't mean that they got the attention they deserved and that it may not be the best handling of the matter, that's for sure. I think the district court said it was not wise, but it wasn't a deliberately neglectful act. Is CMR Texas controlled by Soule? It's another company, yes. They do business in multiple states. So, you know, they get a lot of paper into the office, basically, and if they, you know, if you have something directed to a lawsuit against another party, it's not going to get the same attention that it gets when it's directed to a lawsuit against CMR itself. Mr. Perkins, I'm not sure what we should do on this point, but to say that there was this relationship between Mr. Koerner and Mr. Soule and this comes in and this somehow gets captured in the idea that the company gets a lot of emails, this doesn't ring convincing to me. Mr. Soule knew who Mr. Koerner was, probably knew about this roof. I mean, it's all something that goes into the abuse of discretion, but I think you may be not giving the fairest characterization of how we would look at these contacts between people who knew each other and knew what the dispute was about. Well, to say that they knew each other might be accurate, but he also knew hundreds of other customers, so I'm not sure that there's really this close personal relationship that's alleged here. That's certainly not supported by the papers. It certainly doesn't exist anymore, I would say. Certainly not. So at the time he was receiving all these notices in 2016, it was five years after, at least four years after he had done, they had had the repairs in 2011-12, right? That's right, Your Honor. And normally that would be outside most limitations in Louisiana or preemptions. That's right, and I think there's also a line of cases that support the notion that that five-year period is not interrupted by repairs or assurances of repairs as well, and that's cited in the district court's opinion. Well, that's okay. I think the main point is we're talking about over 10 years after the roof replacement. They've gone out there, they've tried to repair it, and they're still getting bombarded by requests from this one customer. And they still, you know, thought they had resolved this in 2012 when he said, oh, I've got this additional damage, and they sent out the independent contractor because they think, well, we don't want litigation, but we do think it's attributable to Hurricane Isaac, not to anything we did. Was he suing his insurance company over non-payment for Hurricane Isaac? I believe he was suing his insurance company over, well, it really never got flushed out completely, and I think they took what they were heading to a trial date on that claim with Judge Afric, and took a voluntary dismissal, I believe, and went on a, quote, non-litigation track with those claims. So he characterizes Mr. Soule's affidavit to oppose the default as false, but that was the basis on which Judge Afric issued his initial ruling, right? Soule's affidavit. And then Soule wasn't deposed until after the affidavit, right? That's right. He wasn't deposed until after the affidavit, but there are several things going on here. Number one, Mr. Kerner had an opportunity to, and did, oppose the motion to set aside the default when it was filed in April of 2017. Well, and if the affidavit, I mean, did he tell the judge at that time that he thought the affidavit was false? I don't believe he did. On the basis that he had had all these communications with Soule? I don't believe he did, Your Honor. Okay. The deposition of Mr. Soule then took place in August of 2017. Now, what did he say? Yes, the office did receive the papers. Yes, they say what they did. Did anything that he said in his deposition contradict that affidavit? Absolutely not. What Mr. Kerner is trying to say is, you got these papers that named CMR as the defendant in the papers themselves. What Mr. Soule said in his affidavit was, I looked at the cover page of these documents, they named vigilant as a defendant, they named the wrong CMR entity, and they were submitted more than a decade after the work we did. Nothing he said was false. Now, the other thing that happened? Mr. Kerner waited until, did not file anything after that August 2017 deposition, did not use the deposition in opposing summary judgment, only filed this protest about the motion is set aside and these allegedly false statements in his motion reconsider after the court granted summary judgment in October of 2017. So, that we think is pertinent. It's too little too late, and it really relies on a mischaracterization of Mr. Soule's affidavit. There's nothing demonstrably false at all, or nothing false at all in that affidavit. Why don't you address this factual question of the alleged mischaracterization of the roof, the fraud that is not a credentialed fraud, what's your factual explanation of what the assertions were, and what kind of roof this is? There's two elements to that. One is a legal element. That is, what was misrepresented to Mr. Kerner? What were his alleged damages?  What's wrong if he gets the wrong quote type of roof? Another aspect of the legal issue is, why did it take him 11 years to figure that out? And another aspect, which is the basis for our request for affirmance on alternate grounds, is he filed suit on the fraud claims too late, even if you give him the benefit of the doubt on when he discovered it was the wrong type of roof. Now, factually, which I think goes more to your question. I was wondering if you're going to answer that part. I understand you starting with the other. That's all right. Well, it's very strong arguments on the legal side, I believe. But in any event, on the factual side, Mr. Kerner amended his complaint to add these fraud claims in June of 2017 after CMR expressed its intent to file a motion for summary judgment based on preemption. So it came up very late in the game. It wasn't part of any of the original complaint. And what it pertains to is he says, these guys came in and misled me about what type of roof they were going to sell me. So what comes up in the affidavits we submit? That they came out and showed him samples, physical samples, that they provided him with a brochure, that they visited him multiple times. He went and deposed Eric Hunter, the salesman who visited him in Dallas, who confirmed all of that. Well, let me ask on the maybe not the central point, but it seems to me the one that's been emphasized in briefing here is that the tiles themselves are not repelling any water. It's all the membrane underneath. That sounds a little hard to understand why that would be. Is that accepted, that these tiles are actually not water repellent and are not situated on the roof in such a way to keep the water from getting beneath the tiles? I don't think that's correct, Your Honor. There's no expert testimony either way on that point in the record. But what the actual fact of the matter is, these are thinner slate tiles, which makes for a lighter weight roof and an easier installation. That was in the contract, sure. That's right, Your Honor. That was right there in the contract. Slate 2.0, that's the whole notion. And it has a synthetic polymer membrane instead of a felt underlayment. Almost every roof has a membrane, right? That's right, Your Honor. Or whatever covering is on top of it. I mean, to me personally, the notion of thinner slate tiles is still superior to the type of asphalt shingles you may have been referring to earlier. Why did it keep leaking? Was it the installation that was faulty? I think it's the age of the house. It's possible there were some installation issues. Yes, we didn't deny that. Why would the age of the house matter? I'm sorry? Why would the age of the house matter as to whether the slate roof was sufficient? It's an interesting, complicated house. It's not a simple, you know, big roof house. Installation may not have been complete? What are you saying? The grouting or something, or you said? Was it the flashing? I think there were, yes, some issues with the flashing, some issues with joints and where different pieces of the roof met. That's an installation problem. Exactly. And that, if you look at the expert testimony that was provided from the plaintiff, from Louis Reli, is the source of any alleged damages. It's the installation problems. But CMR did the installation. Yes, in 2005, in 2006. That's the whole point. Yeah. That's the whole point of the case, yes. So what damages flow from getting the, quote, wrong type of roof for aesthetic purposes or, you know? There's not a claim anywhere in this case that because of the type of roof that was installed, he had water damage. It's all related to installation issues. There's just this claim that I spent over a million dollars to rehabilitate my house. I got sold the wrong type of roof. And yet, and I do not mean to be snarky. And yet, I could not discern that for 11 years. So it's an interrelated set of issues. But the nature of the roof doesn't cause the type of damages alleged here at all. And I think that's part of the problem that the district court had. Well, I mean, the fact is that it was okay, apparently, until Hurricane Isaac, right? That's part of the facts, yes, Your Honor. And that's your intent, yeah. So, you know, there's a causation issue. There's this prescription issue that the district court didn't reach. But there's also an issue with, and I think this gets to some of the issues that Mr. Mahone sought to raise. He said there's a problem with notice. There's not, because CMR came in and moved for summary judgment, saying there's nothing to support this fraud claim. It, that the record was devoid of factual support for any fraud claim. Well, then, what do you do, I mean, what do you do about this email and, I mean, to get past limitations on fraud, they have to connect 2011 to 2012, right? And to do that, they have that employee statement. I didn't tell him about all the scope of the work because he's a sneaky lawyer. And how do we construe that in a summary judgment context? I think you construe it the same way that the district court did. He said, the employee may have said, I didn't tell him about this at the time. But that doesn't show that they never told him about that at all. Nor does it show that they covered anything up. It just says, hey, I'm going back to the home office before I discuss things further with this guy because he's a lawyer. And probably also because he may have known that he'd had multiple claims for repairs previously. You know, to try to base an entire fraud claim on one email saying, I didn't tell this guy about X at this particular time, you know, there's nothing that flows from that at all. And, in fact, But didn't he also admit that he told Mr. Conner that they would take care of the issue? He didn't detail what they would do to repair it. And they did come out there, and there are job tickets about that in the record as well. So is that a promise? No, it's not. A representation of work to be done? A vague assurance of repairing something does not give rise to a claim of fraud. Every plumber would be in bad shape if that were fraud. That's true. But the other point here is that work was completed in early 2011. Then you have Hurricane Isaac comes along, and you have a whole other set of claims by Mr. Conner. That's the key point here. That's when they said, look, enough is enough. And Mr. Conner comes back and says, enough isn't enough. I'm going to sue you if you don't fix this. And they, as Your Honor said, they kicked in some money and paid this other independent contractor to come out there. Now, did they go out there and look at it to make sure he'd done what he said he would? Yes. But that itself does not give rise to a claim for fraud either. I should know this, but I assume CMR bore the cost of the 2011 repairs? Yes, Your Honor. So that was considered warranty work? I don't know if they—generally, yes. I don't know if they formally considered it warranty work. It's not in the emails or correspondences to that? No, and they also did some additional work at Mr. Conner's request that was unrelated to the repairs. So he had them coming out and doing other things as well. So there's some warranty work, some non-warranty work. Did CMR do work besides the roof, or was it all roof? It's all roof. Okay. So you keep saying throughout your argument that CMR got Velazquez, CMR took on Velazquez, and so on. Does that mean he was—you did not argue independent contractor to the district court, did you? I believe we did, Your Honor. We stated that he was a third party who was brought in to do the work. You know, I'm referring to him colloquially as somebody that CMR brought in. But he was someone—there's a reference by Mr. Conner at one point where he says he had talked to Brian Velazquez and agreed with him to get the work done. So that's, you know, I think the district court's findings are well supported in the record. There were so many claims in the district court involving these various timeframes and various alleged types of claims that a lot of them were not necessarily addressed in, you know, copious detail. But that assertion was made at one point in the summary judgment briefing. All right. In fact, I think we were criticized for raising it in a footnote specifically. Okay. Thank you. Thank you, Your Honor. Okay. Mr. Conner. I'll be quick. August 1, 2016, I said I was going to join him in a vigilante already pursued. On November 21, 2016, CMR was served. On December 14, 2016, I emailed Sule and I sent him a copy of everything and begged him to do it. I also offered him that I would give him an extension. I then—then they served him again on December the 14th. On January the 9th, I called him on his cell phone. We had a bad—because I had his cell phone from 2012. It was a bad connection. So I sent a text message. Well, let me ask you a question, Mr. Conner. When they filed to get relief from the default judgment, why didn't you say at that time that this is a false affidavit and here's why? How was I supposed to know? Well, excuse me, but your claim was—his claim was I didn't take this seriously and it was way beyond the time and you could have said he should—he had to have known it was serious because here are all the contacts I had. I did that. You did? Oh, yes. I had emails, everything. I went through the whole thing. And you filed all that in response to the motion? I was baffled when the district court judge granted the—set it aside. Right. So then I took the man's deposition. It turned out that he had everything. Everything was there. And it's all on record. It's all on brief. It was unequivocal. And now nobody's addressed. What about the fact that the district court judge didn't say anything? All they did was—all the district court didn't ask them to get a—to do a response, snarky or not. There was no response. Before they had to answer, before the eight days was up, he did not. Thank you very much. I appreciate very much the honor of speaking before you. I was before you with Judge Elrod who pointed out that the BP lawyer's brief was snarky too. Thank you, Your Honors. I'll be brief. May it please the Court, Michael Mahone for Lewis-Kerner. Just wanted to run through a few things Mr. Perkins said just to clarify. As far as the alleged damages from the wrong type of roof claim, we asserted a claim for rescission of the contract for fraud. If the truth had been known, we never would have contracted with CMR in the first place and none of the damages suffered by Mr. Kerner would have been incurred. And that claim was clearly pled. I—Mr. Perkins said that Mr. Kerner was shown physical samples, there was some other discussion of that, and that that was discussed in the affidavit that they provided. Well, the problem with that is the only affidavit in the record, and we noted this in our briefs, the only affidavit in the record was from Steve Soule who had no personal knowledge of the meeting between Mr. Kerner and the salesman. CMR didn't have in the record an affidavit from Mr. Hunter. They did initially, but then they had to withdraw that when we weren't able to take his deposition. So the only affidavit was from Soule who had no personal knowledge. Another thing that Mr. Perkins talked about was that there were too many claims and it was difficult to address all of those in a summary judgment. That alone shouldn't be grounds for summary judgment motions being granted without notice to the opposing party and an opportunity to respond. On the independent contractor argument, the only reference to it in the entire brief, the entire summary judgment filed by them was in a footnote where they noted that he was a contractor that Mr. Kerner dealt with. It was never urged as a basis for dismissal. There was no authority cited, no discussion of operational control or any of the other issues that the district court went into in granting relief for CMR. And as far as them saying in their brief that there was nothing to support a fraud claim, as far as the claim on the wrong type of roof, they actually conceded that that claim would be subject to the exception in 2772H, but then they only briefed the dismissal of it on the basis of prescription, not on the basis of any of the issues relied upon by the district court. Lastly, there was some discussion about the 2011 repairs and that that was something separate from what happened in 2012. And the district court noted this in its initial order and reasons that if that wasn't a continuous repair project between 11 and 12, then any claims relating to 2011 would be preempted. But if Gary Clockie, the one who sent the sneaky lawyer email, had indeed misrepresented something to Mr. Kerner and deceived him fraudulently, that would certainly be an exception. What would the exact fraud have been? I mean, to say presumably there was a work order at some point that said we're doing ABC? We have not. I'm not aware of a work order that specified. You never uncovered anything like that in discovery? They just came out and put men up and started hammering? There's internal documentation that shows what they were doing. But that wasn't given to Mr. Kerner. What was represented to Mr. Kerner was we have this inspection report and we're going to fix everything in it. And that's what he believed. And one of the things that he raised a big issue. Why do you say? I mean, on what basis? It's one thing to say we're going to fix everything in it, but we know that old houses have recurring problems and so on. So why does that amount to a fraudulent representation? Because it would have to be fraud if they had no intention to fix everything that was up there. The easiest example that I've got, Your Honor, is one of the issues that was raised in the inspection report that was raised specifically by Mr. Kerner was the lack of a drip edge, which allows water to cascade off the side. And he was told we're going to put a drip edge on there. There was never a drip edge put on there. There is not a drip edge to this day on one portion of the home. So that's not an old house issue. That's simply a they didn't do it issue. Why is that? What transforms that from breach of warranty to fraud? I think you would construe the email that they were withholding information from Mr. Kerner deliberately and draw the inferences in favor of Mr. Kerner on that rather than construing it against him. Not for fraud. You have to be precise as to what is the misrepresentation. Well, and the misrepresentation would be that we're going to do this. What is the fraudulent intent? You've got us. That's rule eight or nine. I believe it's rule nine, Your Honor. And I would say the fraudulent intent is that they were never going to do it. They didn't do it. It was blatantly there. They said they were going to do it. And their later inspection report said we didn't get to this area. Okay, thank you very much. We have your argument. Court will stand in recess.